IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HELEN STOKES, on behalf of herself and all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>REALPAGE, INC.,<br><br><br>                              Defendant. | Civ. A. No. 15-1520 |
| JAMES JENKINS, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>REALPAGE, INC.,<br><br><br>                              Defendant. | Civ. A. No. 15-3894 |

**MEMORANDUM**

**Padova, J.**                                                                                                  **October 18, 2016**

Defendant, RealPage, Inc. ("RealPage") moves to dismiss Count Two of the Complaint filed by Plaintiff Helen Stokes in Civ. A. No. 15-1520, and to dismiss Counts One and Two of the Complaint filed by Plaintiff James Jenkins in Civ. A. No. 15-3894. It argues that, applying the United States Supreme Court's recent decision in Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016), Plaintiffs lack standing to bring their claims, and the Court, therefore, lacks subject matter jurisdiction. Both cases are

filed as class actions alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, et seq.  For the following reasons, both motions are denied.

## I.   FACTUAL ALLEGATIONS

### A.   The Stokes Complaint[1]

In her Complaint, Stokes asserts two class claims against RealPage.  Count One alleges violations of 15 U.S.C. § 1681e(b)[2] and Count Two alleges violations of § 1681g(a).[3]  Each Count is styled as a "Class Claim" and the Complaint defines two classes:  an Expungement Class and a Disclosure Class.[4]  The Prayer For Relief seeks a declaration that RealPage violated the FCRA; an award of statutory, actual and punitive damages; and attorney's fees.  (Stokes Compl.

---

[1] All citations in this section are to the Complaint filed in Civ. A. No. 15-1520.

[2] The statute provides that "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681(b).

[3] The statute provides that "Every consumer reporting agency shall, upon request, and subject to section 1681h(a)(1) of this title, clearly and accurately disclose to the consumer: (1) All information in the consumer's file at the time of the request . . . .  (2) The sources of the information . . . ."  15 U.S.C. § 1681g(a)(1)-(2).

[4] The Stokes Expungement Class is defined as
> All natural persons with an address in the United States and its Territories about whom, beginning two years prior to the filing of this Complaint and continuing through the resolution of this action, Defendant prepared a consumer report which included information regarding one or more criminal case which had been expunged, sealed, or otherwise removed from public dissemination at the time the report was prepared.

(Compl. ¶ 57(a).)  The Stokes Disclosure Class is defined as
> All natural persons with an address in the United States and its Territories who, beginning two years prior to the filing of this Complaint and continuing through the resolution of this action, made a request to Defendant which constituted or which Defendant treated as a request for a full file disclosure, and to whom Defendant sent a document which did not include all of the information Defendant maintained about the requesting consumer.

(Id. ¶ 57(b).)

at 13). RealPage seeks dismissal of only Count Two, which pertains solely to the Disclosure Class.

The Stokes Complaint alleges that RealPage is a consumer reporting agency ("CRA"), as defined by section 1681a(f) of the FCRA. (Id. ¶ 6.) On or around January 8, 2015, with the assistance of her attorney, Stokes requested a copy of her consumer report from RealPage. (Id. ¶ 45.) On January 9, 2015, RealPage and Stokes spoke by phone regarding her request for a copy of her consumer report. (Id. ¶ 46.) Stokes explained that she believed that RealPage had improperly reported to Greenway Presbyterian Apartments ("Greenway"), a prospective landlord,[5] that she was a defendant in several criminal cases, the records of which had been previously expunged.[6] (Id.) RealPage understood this discussion to be a dispute under Section

---

[5] Stokes alleges that after separating from her husband, and under threat of losing her home to foreclosure, she actively sought senior housing. (Compl. ¶ 26.) In or around October 2014, she applied for a residential lease at Greenway Presbyterian Apartments, a senior housing facility in Philadelphia. (Id. ¶ 27.) On or about October 20, 2014, in connection with her application, RealPage prepared and sold a consumer report about Stokes to Greenway. (Id. ¶ 28.)

[6] The Complaint also alleges that, in September of 2008, Stokes was arrested in connection with a domestic dispute and charged with aggravated assault and other lesser charges. The charges were dismissed for lack of evidence. In June of 2010, she was arrested for theft offenses after taking her husband's ATM card from their joint bank account. The charges were subsequently withdrawn. The records of both offenses appeared under her married name of Helen Marie Davis; Plaintiff resumed her maiden name of Stokes after her divorce. These two cases were her only arrests, and she has never been convicted of a crime. (Compl. ¶¶ 16-19.)
By Orders of the Court of Common Pleas of Philadelphia County, dated March 31, 2014, the records of both the 2008 and 2010 arrests and charges were expunged. Certified copies of the Expungement Orders were served on the Philadelphia Police Department, the Pennsylvania State Police, the Administrative Office of Pennsylvania Courts ("AOPC") Expungement Unit, and the First Judicial District of Pennsylvania, Data Processing Unit. The Expungement Orders required the arresting agency to destroy or deliver to Ms. Stokes or her representative all criminal records, fingerprints, photographic plates and photographs pertaining to the charges which resulted from the arrests, and also ordered the Pennsylvania State Police to request the Federal Bureau of Investigation to return to them all records pertaining to the arrest, which were ordered to be destroyed upon receipt. (Id. ¶¶ 20-21.)

1681i of the FCRA. (Id.) In response to the January 9, 2015 phone call, RealPage sent Stokes's counsel corrected copies of the consumer report. However, it did not provide the original inaccurate report that it had provided to the landlord. (Id. ¶ 47.)

Furthermore, when RealPage prepared its report on Stokes for Greenway in October 2014, it could not have found the charges against Stokes in searched any public records, since her charges had been eliminated from all public records by that time. (Id. ¶ 41.) Instead, RealPage reported the expunged cases from its database, or from the database of a third-party vendor, without any effort to learn whether those cases had been expunged. (Id. ¶ 42.) As a result of the inaccurate report, Greenway denied Stokes's rental application. (Id. ¶ 43.) Thereafter, she learned from Greenway that RealPage was the source of the report. (Id. ¶ 44.)

Shortly after Stokes requested her consumer report from RealPage, she applied for a residential lease at Scottish Rite Tower ("SRT"), another senior housing facility in Philadelphia. (Id. ¶ 48.) Even though Stokes had disputed the report RealPage provided to Greenway, RealPage prepared and sold a consumer report about her to SRT which, like the Greenway report, improperly included the expunged arrests from 2008 and 2010. (Id. ¶ 49.) As a result of the inaccurate report, SRT denied Stokes's rental application. (Id. ¶ 50.)

Thereafter, Stokes asked RealPage for a complete copy of her consumer file. (Id. ¶ 51.) On February 3, 2015, RealPage sent her a document purporting to be a file disclosure, but it did

---

The 2008 and 2010 arrests of Ms. Stokes were removed from the AOPC database within days of the entry of the Expungement Orders. On June 10, 2014, the Pennsylvania State Police certified that all criminal record history pertaining to the 2008 and 2010 arrests of Ms. Stokes was expunged from their files. On June 23, 2014, the Philadelphia Police Department certified that all criminal record history pertaining to the 2008 and 2010 arrests of Ms. Stokes was expunged from their files. (Id. ¶¶ 22-24.) Notwithstanding these expungements, the October 20, 2014 consumer report prepared by RealPage improperly and inaccurately reported both the 2008 and 2010 arrests and charges. (Id. ¶ 29.)

not contain any criminal history information. (Id. ¶ 52.) On February 18, 2015, Stokes's attorney made a second request for a complete copy of Stokes's file. (Id. ¶ 53.) RealPage sent Stokes a "full file disclosure," which showed that RealPage had reported the expunged cases to the two prospective landlords. (Id.) However, even that document failed to disclose all of the information RealPage maintains about Stokes, including the source of the criminal records it previously reported to Greenway and SRT. (Id. ¶¶ 53.)

The Complaint alleges that Stokes was harmed by RealPage's failure to provide full file disclosures for the following reason: since this was not an employment situation governed by 15 U.S.C. §§ 1681b(b) and 1681g, where a consumer is entitled to a pre-adverse action notice and a copy of the consumer report,[7] Stokes had no opportunity to correct RealPage's report before Greenway and SRT made their decisions on the rental applications. Consequently, RealPage "impeded [Stokes] from trying to advocate on her own behalf to try to obtain admission into the senior housing that she so desperately needs." (Id. ¶ 54.) The Complaint further alleges, with respect to the Disclosure Class, that RealPage violates the FCRA "by failing to provide all of the information it maintains about consumers upon request, including the source(s) of criminal record information." (Id. ¶ 59.)

---

[7] Section 1681b(b) provides:

(b) Conditions for furnishing and using consumer reports for employment purposes
    (1) Certification from user
        A consumer reporting agency may furnish a consumer report for employment purposes only if –
        . . .
        (B) the consumer reporting agency provides with the report, or has previously provided, a summary of the consumer's rights under this subchapter, as prescribed by the Bureau under section 1681g(c)(3) of this title.

15 U.S.C. § 1681b.

B.     The Jenkins Complaint[8]

James Jenkins alleges in his Complaint that he applied to rent an apartment in May 2014. (Jenkins Compl. ¶ 8.)  RealPage prepared a consumer report about him on or around May 19, 2014, and sold it to his prospective landlord.  (Id. ¶¶ 8-9.)  The report contained derogatory and inaccurate criminal record information, including criminal convictions for passing a bad check and for sexual assault.  (Id. ¶ 10.)  Neither record actually pertained to Jenkins, who has never been convicted of a crime.  (Id. ¶ 11.)

Jenkins made a file disclosure request to RealPage, and received what RealPage asserted was a complete copy of his file on or around May 29, 2014.  (Id. ¶¶ 13-14.)  The document RealPage provided failed to identify the source(s) from which it obtained the inaccurate criminal record information, and instead falsely stated that it obtained the records from one or more courthouses where the criminal convictions originated.  (Id. ¶¶ 15-16.)  In addition, RealPage's disclosure failed to provide complete contact information in the "Summary of Rights" form required to be disclosed to consumers by the FCRA.  (Id. ¶ 23.)

Jenkins asserts two class claims.  Count One alleges a violation of 15 U.S.C. § 1681g(a)(2) based on RealPage's failure to disclose the sources of information for the criminal conviction data it includes in consumer files.  (Id. ¶ 28.)  Count One is brought on behalf of the following Class:

> All natural persons who requested a copy of their consumer report (or consumer file) from Real Page on or after November 5, 2009, and received a report that failed to identify the source(s) of the information (*i.e.*, Real Page's third party vendor) for any criminal conviction data in the report.

---

[8] All citations in this section are to the Complaint filed in Civ. A. No. 15-3894.

(Id. ¶ 26 (the "Jenkins Disclosure Class").) Count Two alleges a violation of 15 U.S.C. § 1681g(c)(2), based on RealPage's failure to provide consumers with the required Summary of Rights disclosure. (Id. ¶ 39.) Count Two is brought on behalf of the following Class:

> All natural persons who requested a copy of their consumer report (or consumer file) from Real Page on or after January 1, 2013, and received a report that did not contain the current "Summary of Rights" required by the Fair Credit Reporting Act and as promulgated by the Consumer Financial Protection Bureau.

(Compl. ¶ 37 (the "Jenkins Summary of Rights Class").)[9] The class claims seek statutory and punitive damages, and attorney's fees. (Compl. at 11.)

### C. Material Outside of the Pleadings

The parties have appended sworn declarations to their moving papers. Stokes declares in pertinent part that she did not have a copy of the report RealPage provided to Greenway and SRT, she wanted to see a copy of the report because she believed that the report improperly included the expunged 2008 and 2010 cases, she did not know where RealPage obtained information about the expunged cases, and she was confused because information about those cases was no longer publicly available after the expungement orders. (Stokes Decl. ¶¶ 12-14.) She further states that when she finally received documents from RealPage containing the expunged cases, those documents did not identify the source from which RealPage obtained the records. (Id. ¶ 16.) Stokes maintains that, if RealPage had provided her with the source from which it obtained information regarding the expunged cases, she could have taken steps to inform that source that the cases had been expunged, and avoided the cases being reported to other landlords in the future. (Id. ¶¶ 16-17.) Jenkins declares that he does not know where RealPage obtained incorrect criminal records information about him, that the documents he received from RealPage do not

---

[9] Jenkins also asserts an individual claim for violation of 15 U.S.C. § 1681(e)(b), based on the alleged inaccuracies in his consumer report, which is not within the purview of the pending Motion to dismiss. (See Compl. ¶ 47.)

identify any source other than the courthouses from which it obtained the criminal records mentioned in the report, and that the documents provided by RealPage did not include full contact information for the federal agencies responsible for enforcing the FCRA.  (Jenkins Decl. ¶¶ 5-7.)

RealPage has submitted the Declarations of its Senior Vice President Debra Stockton.  In the Stokes case, Stockton declares that RealPage opened an investigation on January 9, 2015, to determine whether the criminal records in Stokes's report should be removed.  (Stockton Decl. (Stokes) ¶ 6.)  The investigation concluded on January 14, 2015, at which time it was determined that the records should be removed, and RealPage provided a corrected copy of Stokes's file to her attorney.  (Id. ¶¶ 7-8.)  Subsequently, on February 2, 2015, RealPage received a request from Stokes for her consumer file.  (Id. ¶ 9.)  RealPage responded on February 3, 2015, by providing a copy of its then current file, which did not include the expunged criminal records that had already been removed.  (Id. ¶ 10.)  When, on February 18, 2015, Stokes's attorney requested a copy of her "historic report," which was no longer in RealPage's files, it obtained a copy from one of the prospective landlords and sent it to Stokes's counsel.  (Id. ¶ 11.)  It also alerted its vendor about the expunged records.  (Id. ¶ 12.)

In the Jenkins case, Stockton declares that RealPage provided Jenkins with a file disclosure on May 29, 2014, which included a Summary of Rights that unintentionally omitted complete addresses for certain federal agencies.  (Stockton Decl. (Jenkins) ¶¶ 4-5.)  Prior to requesting his file, Jenkins had initiated a dispute with RealPage regarding the criminal record data that RealPage had reported about him.  (Id. ¶ 7.)  RealPage investigated and determined that the criminal record data did not appear to belong to Jenkins and removed it from his file.  (Id.)  When Jenkins requested his file, RealPage had already completed its investigation and removed the criminal record data from his file.  (Id. ¶ 8.)

**II.     STANDARD OF REVIEW**

RealPage seeks partial dismissal of Plaintiffs' Complaints because Plaintiffs allegedly lack standing.  "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."  Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014) (alteration in original) (quoting Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007)).  RealPage asserts both facial and factual attacks on the Court's subject matter jurisdiction, arguing that Stokes and Jenkins have failed to allege a concrete and particularized injury with respect to either their individual or class claims.  (See Def. Mem. at 6.)

A facial attack considers only "a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the courts" due to some jurisdictional defect.  Aichele, 757 F.3d at 358.  This type of attack is brought prior to the filing of an answer or a challenge to the factual allegations of a complaint.  Id. (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 889-92 (3d Cir. 1977)).  It is judged under the same standard as a motion to dismiss pursuant to Rule 12(b)(6).  Id.  A factual attack concerns "'the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'"  Id. (alterations in original) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)).  When it reviews a factual attack, the court may consider evidence outside the pleadings.  Id. (citing Gould Elec., Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000)).  The non-moving party's allegations receive no presumption of truthfulness.  CNA, 535 F.3d at 139.  "[P]laintiff has the burden of persuasion to convince the court it has jurisdiction."  Gould Elec., Inc., 220 F.3d at 178 (citation omitted).  "In sum, a facial attack 'contests the sufficiency of the pleadings,' 'whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'"  Aichele, 757 F.3d at 358 (alterations in original) (quoting In re Schering Plough

9

Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012); and CNA, 535 F.3d at 139).

Since, in the materials outside of the pleadings, Plaintiffs essentially reassert as facts the allegations of the Complaints, and Defendant's factual material essentially admits certain of the allegations of the Complaints relevant to the standing issue — namely that the original Stokes disclosure did not contain the "historic" report and the Jenkins disclosure omitted complete contact information, there is no need to weigh these facts supporting Plaintiffs claims to standing and we thus merge our discussion of the facial and factual attacks.

## III. DISCUSSION

RealPage argues that Plaintiffs lack standing to bring the Stokes Disclosure Class claim, the Jenkins Disclosure Class claim, and the Jenkins Summary of Rights Class claim (collectively "the class claims") because no Plaintiff is alleged to have suffered an invasion of a legally protected interest that is concrete and particularized. It relies on the recent United States Supreme Court decision in Spokeo, as well as long standing case law with respect to Article III standing. Like the plaintiff in Spokeo, who brought a purported class action for alleged willful technical violations of the FCRA, RealPage argues that the class claims in these cases allege only technical violations, devoid of any particularized or plausible allegations of concrete harm. Thus, it asserts, Plaintiffs cannot establish that they sustained any injuries-in-fact to support their standing and our subject matter jurisdiction because they have alleged mere technical violations that could have had no real impact on putative class members.

To invoke the judicial power under Article III, a litigant must have standing. See Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013). It is the plaintiffs' burden to prove standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). The standing doctrine

"limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Spokeo, 136 S. Ct. at 1547 (citations omitted). The "irreducible constitutional minimum" of standing consists of three elements. Lujan, 504 U.S. at 560. The plaintiff must prove (1) an injury in fact (2) fairly traceable to the challenged conduct (3) that is likely to be "redressed by a favorable judicial decision." Hollingsworth, 133 S. Ct. at 2661 (citing Lujan, 504 U.S. at 560-61). An injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 561 (internal quotation marks and citations omitted); Spokeo, 136 S. Ct. at 1545 ("[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both concrete *and* particularized." (emphasis in original)). "Injury in fact is a constitutional requirement, and '[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.'" Spokeo, 136 S. Ct. at 1547-48 (quoting Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997)); see also Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100 (1979) ("In no event . . . may Congress abrogate the Art. III minima").

The Spokeo Court, while reiterating that an intangible injury created by a statute is sufficient to satisfy the injury-in-fact requirement, went on to hold that Article III standing requires an injury that is both particularized and concrete even in the context of a statutory violation. Id. at 1549. Because the injury-in-fact analysis contained in the decision of the United States Court of Appeals for the Ninth Circuit had "elided" the independent concreteness requirement, id. at 1548, and addressed only the "particularization" aspect of the test, the Court remanded the case for further proceedings. Id. at 550. In holding that concreteness is different from particularization and requires an injury to actually exist, the Court held that a "bare

11

procedural violation, divorced from any concrete harm, [does not] satisfy the injury-in-fact requirement of Article III." Id. at 1549. The Court stated:

> Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation.

Id. To identify whether an intangible injury is concrete, "both history and the judgment of Congress play important roles." Id. The Court observed that because the case-or-controversy requirement at the heart of the standing inquiry "is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." Id. (citing Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 775-77 (2000)). The Court also recognized that, "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements," it has the power to "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate at law" and to "define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." Id. (internal citations and quotation marks omitted). But, the Court cautioned that plaintiffs do not automatically satisfy the injury-in-fact requirement merely because a statute grants a right of action. Id. The Court specifically noted that a plaintiff "cannot satisfy the demands of Article III by alleging a bare procedural violation," such as a violation "of one of the FCRA's procedural requirements," because such a violation, like providing an incorrect zip code for a consumer reporting agency, may not "cause harm or present any material risk of harm . . . . It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." Id.

12

Because the history and judgment of Congress are relevant to whether a plaintiff has alleged a concrete harm under FCRA, we consider the law's legislative history. As one post-Spokeo district court decision has explained, albeit in considering a different section of the statute,

> Congress emphasized that "the consumer has a <u>right to know</u> when he is being turned down for credit, insurance, or employment because of adverse information in a credit report <u>and to correct</u> any erroneous information in his credit file." [S. Rep. No. 517, 91st Cong., 1st Sess. 2 at 2] (emphasis added). Therefore, Congress wished to "establish [] the <u>right of a consumer to be informed</u> of investigations into his personal life" <u>and to "be told</u> the name of the agency making the report" whenever the individual "is rejected for credit, insurance or employment because of an adverse credit report[.]" <u>Id.</u> at 1 (emphasis added).
> . . .
> In sum, the FCRA reflects Congress' concern with the "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4). It is clear from the statute's legislative history that Congress intended that the FCRA be construed to promote the credit industry's responsible dissemination of accurate and relevant information and to maintain the confidentiality of consumer reports.

<u>Thomas v. FTS USA, LLC</u>, Civ. A. No. 13-825, 2016 WL 3653878, at *7-8 (E.D. Va. June 30, 2016) (alterations in original); see also <u>Hauser v. Equifax, Inc.</u>, 602 F.2d 811, 817 (8th Cir. 1979) ("The purpose of the Act's disclosure requirement [in 15 U.S.C. § 1681g(a)] is to provide the consumer with an opportunity to dispute the accuracy of information in his file."); <u>Gillespie v. Equifax Info. Servs., LLC</u>, 484 F.3d 938, 941 (7th Cir. 2007) (stating that the primary purpose of disclosure requirement is to "allow consumers to identify inaccurate information in their credit files and correct this information").

Two appellate courts have applied <u>Spokeo</u> to claims similar to those at issue in the pending Motion. The United States Court of Appeal for the Third Circuit recently decided <u>In re Nickelodeon Consumer Privacy Litig.</u>, 827 F.3d 262 (3d Cir. 2016), a case asserting violations of the Video Privacy Protection Act. Plaintiffs alleged that defendant failed to disclose that it

13

placed "cookies" on the computers of children who used its websites in order to track communications with other websites for the purpose of advertising. Id. at 267-269. In discussing the requirement that a plaintiff must have suffered an injury-in-fact to have standing, the Third Circuit observed that "in some cases an injury-in-fact may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing," and noted that "Spokeo directs us to consider whether an alleged injury-in-fact 'has traditionally been regarded as providing a basis for a lawsuit,'" and that "Congress's judgment on such matters is . . . 'instructive and important.'" Id. at 273-74 (quoting In re Google Inc. Cookie Placement Consumer Privacy Litig., 806 F.3d 125, 134 (3d Cir. 2015) and Spokeo, 136 S.Ct. at 1549). The Nickelodeon court determined that nothing in Spokeo

> calls into question whether the plaintiffs in this case have Article III standing. The purported injury here is clearly particularized, as each plaintiff complains about the disclosure of information relating to his or her online behavior. While perhaps "intangible," the harm is also concrete in the sense that it involves a clear *de facto* injury, i.e., the unlawful disclosure of legally protected information. Insofar as Spokeo directs us to consider whether an alleged injury-in-fact "has traditionally been regarded as providing a basis for a lawsuit." Google noted that Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private.

Id. at 274 (quoting Spokeo, 136 S. Ct. at 1549; Google, 806 F.3d at 1348 n. 19.). Accordingly, the Third Circuit concluded that the Nickelodeon plaintiffs' allegations with regard to the defendant's use of cookies were sufficient to establish Article III standing. Id.

In Church v. Accretive Health, Inc., No. 15-15708, 2016 WL 3611543, at *2-3 & n.2 (11th Cir. July 6, 2016), a case brought under Fair Debt Collections Practices Act ("FDCPA"), the United States Court of Appeals for the Eleventh Circuit held that a claim that a letter defendant sent to plaintiff that did not contain all of the FDCPA's required disclosures sufficiently alleged that the plaintiff "had sustained a concrete — i.e., 'real' — injury because

14

she did not receive the allegedly required disclosures." Id. at *3. The Eleventh Circuit explained that:

> The invasion of Church's right to receive the disclosures is not hypothetical or uncertain; Church did not receive information to which she alleges she was entitled. While this injury may not have resulted in tangible economic or physical harm that courts often expect, the Supreme Court has made clear an injury need not be tangible to be concrete. []  Rather, this injury is one that Congress has elevated to the status of a legally cognizable injury through the FDCPA. Accordingly, Church has sufficiently alleged that she suffered a concrete injury, and thus, satisfies the injury-in-fact requirement.

Church, 2016 WL 3611543, at *3 (internal citations and footnotes omitted).

RealPage argues that the standing issue raised by the class claims is identical to the standing issue presented in Spokeo: the Complaints' allege statutory violations of the FCRA, with no actual harm, which are thus insufficient to confer Article III standing. The class claims, RealPage asserts, allege only technical violations, devoid of any particularized or plausible allegations of concrete harm that do not establish that Plaintiffs sustained any injuries-in-fact because there was no real impact on the putative class members. Plaintiffs respond that Congress's reasons for enacting the FCRA show that it intended that the law be construed to promote the credit industry's responsible dissemination of accurate and relevant information, and afford consumers the substantive right to receive certain specified information. Thus, they maintain that they have alleged an injury-in-fact based on Congress's having created a substantive legal right, the invasion of which creates standing.

We find that, like in Nickelodeon, where the unlawful disclosure of legally protected information was determined to constitute a concrete harm because Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of such information, the inaccurate or incomplete disclosure to a consumer of the source of a CRA's reported information has been elevated by Congress to the status of a legally cognizable injury. We further find that

the injury alleged here is sufficiently concrete to provide standing since Plaintiffs allege both the dissemination of inaccurate information about a consumer, and a failure to disclose the source of that information to the consumer. The Classes' allegations that they did not receive the information to which they were entitled under the statute is, we conclude, sufficient to plead and establish a concrete harm since it goes to the core of the interests Congress sought to protect. In contrast to the examples cited in Spokeo — where the Court surmised that accurate but undisclosed information, or incorrect but minor information like a zip code were the type of technical violations incapable of creating a concrete harm — here Plaintiffs allege a substantive *de facto* violation involving undisclosed and inaccurate information of the kind Congress required be disclosed to protect consumers, namely the source of the consumer information that the CRA reported. Without accurate source information, a consumer would be left confused as to where to go to correct erroneous data contained in a report and be unable to know whether any erroneous data would find its way into future consumer reports. Because the class claims involve more than technical violations of the statute, we find that Plaintiffs have standing to pursue their claims. We therefore deny the Motions to Dismiss.

An appropriate Order will be entered.

BY THE COURT:

/s/ John R. Padova
JOHN R. PADOVA, J.