IN THE UNITED STATES DISTRICT COURT

              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

    HELEN STOKES, et al. &    :    CIVIL ACTION
    JAMES JENKINS             :    15-CV-1520 &
                              :    15-CV-3894
              Plaintiffs      :
         vs.                  :    Philadelphia, Pennsylvania
                              :       August 2, 2017
    REALPAGE, INC.            :
                              :
              Defendant       :    MOTIONS HEARING
    - - - - - - - - - - - - - - - - - - - - - - - - - - -

                 BEFORE THE HONORABLE JOHN R. PADOVA
                   UNITED STATES DISTRICT JUDGE

    APPEARANCES:

    For the Plaintiffs:     JAMES A. FRANCIS, ESQUIRE
                            DAVID A. SEARLES, ESQUIRE
                            FRANCIS & MAILMAN, P.C.
                            Land Title Building, 19th Floor
                            100 South Broad Street
                            Philadelphia, Pennsylvania  19110

                            SHARON DIETRICH, ESQUIRE
                            COMMUNITY LEGAL SERVICES
                            1424 Chestnut Street
                            Philadelphia, Pennsylvania 19102

    For the Defendant:      RONALD I. RAETHER, JR., ESQUIRE
                            TROUTMAN SANDERS, LLP
                            5 Park Plaza, Suite 1400
                            Irvine, California 92614-2545

                            SHARON F. McKEE, ESQUIRE
                            HANGLEY ARONCHICK SEGAL
                            PUDLIN & SCHILLER
                            One Logan Square 27th Floor
                            Philadelphia, Pennsylvania 19103

    Deputy Clerk/
    ESR Operator:           Michael Beck

    TRANSCRIBED BY:         Drummond Transcription Service
                            Haddon Heights, New Jersey  08035

        Proceedings recorded by electronic sound recording,
    transcript produced by computer-aided transcription
    service.

1         (At 11:00 a.m. in Courtroom 17B.)

2         DEPUTY CLERK:  All rise.

3         Court is now in session, the Honorable John R. Padova

4    presiding.

5         THE COURT:  Good morning, all --

6         ALL PRESENT:  Good morning, your Honor.

7         THE COURT:  -- and welcome to our visitors, who are

8    here *pro hac vice*, thank you and you may be seated.

9         Well, we have on the calendar this morning, a hearing

10   on a motion for the preliminary approval of the class action

11   settlement involving the case of <u>Stokes versus Realpage</u>, Civil

12   Action No. 15-1520 and <u>Jenkins versus Realpage</u>, Civil Action No.

13   15-3894.

14        Who is going to present on behalf of the moving party?

15        MR. FRANCIS:  Jim Francis, your Honor.

16        THE COURT:  Mr. Francis, you may proceed.

17        MR. FRANCIS:  Thank you.  May I approach, your Honor?

18        THE COURT:  Yes, please do.

19        May it please the Court, Jim Francis for the Stokes

20   and Jenkins, plaintiffs.

21        Your Honor, I would also like to introduce my co-

22   counsel David Searles from my firm.

23        MR. SEARLES:  Good morning, your Honor.

24        THE COURT:  Mr. Searles, good morning.

25        MR. FRANCIS:  As well as, Sharon Dietrich from

1  Community Legal Services.

2          MS. DIETRICH:  Good morning, your Honor.

3          THE COURT:  Welcome, Counsel.

4          MS. DIETRICH:  Thank you.

5          MR. FRANCIS:  And in the back are also other CLS

6  fellows or Michael Hollander, actually, is a lawyer -- a CLS as

7  well --

8          THE COURT:  Very good.

9          MR. FRANCIS:  -- and so, we're happy to have them here

10  as well.

11          THE COURT:  To our intern, CLS means Community Legal

12  Services.

13          MR. FRANCIS:  Your Honor, that's a very good intro,

14  where I'd like to start --

15          THE COURT:  Okay.

16          MR. FRANCIS:  -- if it would be okay with the Court --

17          THE COURT:  Yes, sir.

18          MR. FRANCIS:  -- I'd just like to provide some content

19  and a backdrop for the settlement that we are seeking approval

20  of, my goal is to outline the context of where the settlement

21  came from that might not be apparent from the -- the docket or

22  the motion.

23          Your Honor, this was a case that came to my firm by

24  way of CLS.  The Court is, undoubtedly aware of CLS's role in

25  the community on behalf of low-income Philadelphians,

1    specifically, tenants, employees, job applicants and the work

2    that CLS does is enormously important for the community.

3            I have had the fortune and the benefit and, frankly,

4    the honor of having CLS come to me from time to time to

5    prosecute a Fair Credit Reporting class action and they have

6    come to me in the past and this is a case they've approached me

7    on as well.

8            And CLS -- and specifically, Ms. Dietrich -- if the

9    Court has questions, she can provide additional context, but was

10   seeing a problem whereby consumers, tenants and job applicants,

11   who had had a minor offense that had been expunged, were finding

12   out that when they went to apply for an apartment or apply for a

13   job, that the background screening company was still reporting

14   that expunged offense.

15           And why is that happening?  And we were able to figure

16   out, that at least, in some circumstances, the reason was, the

17   defendant background check agency was not processing records

18   that were coming from the Administrative Office of the

19   Pennsylvania Courts.

20           And within the last, I don't know ten -- I think, ten

21   years -- Ms. Dietrich might correct me -- the Pennsylvania

22   Administrative Office of the Pennsylvania Courts began supplying

23   consumer-reporting agencies with something called, a life-cycle

24   file.

25           So, if I can just provide a little more backdrop.  So,

1   the background-checking agencies, like, Realpage, the defendant

2   in this case, they'd get court records often or sometimes, those

3   court records are updated, they might be expunged, they might

4   subsequently be sealed, they might be dismissed.

5          And what sometimes happens is, the court record

6   reports on the original record without reporting the fact that

7   the -- excuse me -- that the -- the record had been expunged or

8   changed.  Ms. Dietrich --

9          THE COURT:  Okay.

10          So, this result in the typical case, it results within

11   the context of a -- a proposed creditor making application to a

12   company like, Realpage for background information under the

13   Federal Credit Reporting Act as required by the Federal Credit

14   Reporting Act with respect to a person, who was interested in

15   borrowing money from that creditor, that's -- that's backdrop

16   for this issue.

17          MR. FRANCIS:  That is the backdrop, your Honor, except

18   it not only affects the creditor/lender relationship, it also

19   occurs in the context of a tenant applying for an apartment --

20          THE COURT:  Okay.

21          MR. FRANCIS:  -- or job applicant applying for a

22   job --

23          THE COURT:  Okay.

24          MR. FRANCIS:  The FCRA applies in all of those

25   contexts.

1          THE COURT:  Okay.

2          MR. FRANCIS:  This case is not about the

3   lender/creditor context --

4          THE COURT:  About --

5          MR. FRANCIS:  -- it's about the -- the context of Ms.

6   Stokes, who was applying for an apartment and Realpage supplies

7   decisions for landlords to make decisions.

8          So, CLS came to us with -- with this issue, that they

9   had seen before and -- and in full candor to the Court, we have

10   seen this issue previously in connection with other companies,

11   like Realpage and frankly, other litigation that CLS has brought

12   to us.

13          So, that was the backdrop for what was happening.

14          Additionally, we saw that when Ms. Stokes, who was the

15   subject of one of these reports, that -- that included an

16   expunged defense for her, that cleared by the court, we saw that

17   there was another claim and that claim is that, the -- when she

18   passed her a copy of her file from Realpage, they did not

19   disclose the source of that record, instead they just disclosed

20   the this came from the court, when in fact, we had knowledge

21   and/or evidence that Realpage was getting its court records from

22   an intermediary or a vendor.

23          My firm obtained a decision, it was from Judge

24   Buckwalter from this court, your Honor's colleague, about four

25   years ago in a case called, <u>Dennis versus Transunion</u> in which

1    Judge Buckwalter in the district -- the Eastern District of

2    Pennsylvania held in that case that:

3            The failure of the consumer reporting agency to

4        disclose the intermediary or the vendor that they used

5        to disclose public records, it is a violation of Section

6        1681(g) of the Fair Credit Reporting Act.

7            I know this is a lot of backdrop, but I think it will

8    help explain where the --

9            THE COURT:  Is that a settled issue in the Third

10    Circuit?

11            MR. FRANCIS:  Well, it's not a settled issue in the

12    Third Circuit, your Honor, because that case is still ongoing

13    and I would -- I will admit to the Court, that there is

14    vociferous debate over whether Judge Buckwalter's interpretation

15    and our view of the law, is the right one.

16            THE COURT:  How about our other circuits?

17            MR. FRANCIS:  Nothing has held, specifically, that

18    clearly on that issue.  So, it has not been --

19            THE COURT:  So, we have a significant and serious

20    challenge to the underlying principle of the law upon which the

21    plaintiffs' case is based?

22            MR. FRANCIS:  That's correct, your Honor.

23            So, that was the base -- so, we brought this case and

24    we had a Rule 16 conference in front of the Court early on that

25    I recall based upon two class claims, Section 1681(e)(b), which

1    that's the provision of the Fair Credit Reporting Act that I'll

2    refer to as the accuracy provision.   That provision requires

3    that when a background screening agency or a credit reporting

4    agency reports information about a consumer, they have to report

5    it subject to the -- the following standard, reasonable

6    procedures to assure maximum possible accuracy.

7           It's our -- it was our claim and allegation that

8    Realpage's failure to note that the -- Ms. Stokes' offense had

9    been expunged and instead, reporting out the original, outdated

10   version of that, it was a failure to use reasonable procedures

11   to assure maximum possible accuracy.

12          The second class claim was what I alluded to as to the

13   Dennis versus Transunion case, which was that when Ms. Stokes

14   asked for a copy of her file, Realpage did not disclose the

15   actual source, which was a company called, Genuine Data

16   Services.

17          Section 1681(g)(a) of the Fair Credit Reporting Act

18   requires that when a consumer asks for a copy of their credit

19   report or their background check, the CRA has to provide all

20   information in the file -- all information -- as well as the

21   sources of the information.   So, this is that source claim

22   issue, that I -- I outlined earlier.

23          That was the case, we did not know this, but I will

24   call them, friendly competitors or colleagues from -- from

25   Virginia had filed a similar case in Jenkins.   And they did not

1    have the EB claim, the expungement claim, they had only two

2    different (g) claims.

3          They had had some -- which I was not part of -- they

4    had had some -- an early mediation effort with Realpage and

5    then, in July of 2015, all of us had a mediation before JAMS --

6    Judge Welsh -- JAMS, a former Magistrate Judge of this Court,

7    again, in July of 2017, that did not resolve the case, we made

8    some progress, it did not resolve the case.

9          After that, we exchanged discovery and as the Court is

10   aware -- and your Honor may recall -- at some point in the

11   middle of discovery of this case, the Supreme Court came down a

12   decision called, Spokeo, which we've all probably heard a lot

13   about.  And the defendant moved for a stay and this Court

14   granted a stay of this litigation until the United States

15   Supreme Court had, actually, issued its Spokeo decision and it

16   stayed the case, based upon the Supreme Court's granting of the

17   certiorari petition from Spokeo.

18         Thereafter, the Supreme Court came down with Spokeo, I

19   don't think it's a surprise to the Court that we had two very

20   different views of the impact.  In our view and I think it's

21   been confirmed by the Third Circuit in -- In Re: Horizon and

22   subsequently -- it is our view, Spokeo did not change the law at

23   all, it clarified the Supreme Court's precedent regarding

24   standing -- Article III standing.

25         Not surprisingly, as well the defendant took a

1    different view and, therefore, it moved to dismiss plaintiffs'

2    Section 1681(g) claims on the basis that, in light of Spokeo,

3    the claims -- the plaintiff did not have standing and the claims

4    should be dismissed under 12(b)(1) and summary judgment.

5           Briefing was -- briefing occurred -- and this Court

6    denied that motion.  Thereafter and only thereafter, did the

7    parties resume settlement discussions, resumed discovery and

8    were finally, after many, many months and many discussions, able

9    to hammer out the settlement that is before your Honor for your

10   Honor's approval and review.

11          So, the reason I'd bring all of that up, is the record

12   should be clear -- and I hope it's clear -- but I'm happy to

13   address any questions the Court has, obviously, that this was

14   not a case where there was any collusion, there was -- this was

15   not the filing of a complaint, where thirty days later the

16   settlement occurred.  This was arm's length, all of the way,

17   motions to dismiss, discovery, unsuccessful mediation.

18          And I think, your Honor might know of this, Judge

19   Welsh is one of the best FCRA mediators in the country --

20          THE COURT:  Yes.

21          MR. FRANCIS:  -- and she was not able to get this case

22   resolved.

23          So, there was clear arm's length negotiation here, I

24   would argue that there is -- there is no obvious deficiencies in

25   the settlement that's been proposed.  And the settlement readily

1   meets the standard for preliminary approval.

2         But I'd like to also tell you -- tell your Honor --

3   why I think, even if this were a final approval hearing, this is

4   what I intend to argue at a later date, I think this is a very,

5   very good settlement and I'll tell you why.

6         First, the settlement provides for injunctive relief

7   for three separate classes.  The question of whether or not, the

8   FCRA permits injunctive relief is not settled in this circuit.

9   I must disclose to the Court that to my disappointment, the

10  majority of the cases have found that the FCRA does not provide

11  injunctive relief, that that -- that the only entity that can

12  provide -- that can obtain injunctive relief is the FTC or the

13  CFPB, that private litigants cannot obtain it.  So, the

14  relevance of that is that, in this settlement, we've been able

15  to obtain what the law, likely, would not have allowed us to

16  obtain.

17        In addition, there are three classes before the --

18  before the Court.  One, the -- I'll call it, the expungement

19  class, we've learned through discovery that there are a hundred

20  and thirty people, who are -- within the expungement class.

21  Each of those people gets a guaranteed payment of eleven hundred

22  dollars.

23        The FCRA provides a maximum statutory damage of a

24  thousand dollars, so we've exceeded what the FCRA permits for

25  statutory damages and we would consider that to be a very, very

1   good result.

2           And if the Court would like us to do it now or in

3   connection with subsequent briefing or if you'd want us to

4   address it at a later date, we would be happy to provide the

5   Court with a canvassing of the law of these settlements.  And I

6   can assert to the Court, eleven hundred dollars is a very good

7   result for this type of a claim.  Next --

8           THE COURT:  And that's if --

9           MR. FRANCIS:  Sure.

10          THE COURT:  -- there is going to be enough money to

11  go around, which is one of the problems I have and I do want you

12  to continue making your presentation, but we're going to come

13  back to that problem and really focus on it.

14          MR. FRANCIS:  Okay, your Honor --

15          THE COURT:  Okay.

16          MR. FRANCIS:  -- understood.

17          As for the -- the source class --

18          THE COURT:  I mean, if every -- if we have the right

19  number with respect to the members in the expungement class and

20  every member of that class got eleven hundred dollars, that

21  would be a hundred dollars more than they were entitled to under

22  the statute, is that correct?

23          MR. FRANCIS:  It is, your Honor, but they're also

24  giving up a -- actual damages.

25          THE COURT:  Yes, okay, okay.

1        MR. FRANCIS:  So --

2        THE COURT:  Well --

3        MR. FRANCIS:  Yes.

4        THE COURT:  -- how did you determine, the number of

5    members in the expungement class?

6        MR. FRANCIS:  The defendant's records, the -- were

7    able to identify that, specifically, by reference to that life-

8    cycle file, that I mentioned.

9        Pennsylvania has this -- it's unlike, other courts and

10   other states, I have not seen something like this -- Ms.

11   Dietrich might know better than I do -- but I have not seen

12   another court or a court system or a state court, that provides

13   the type of life-cycle subsequent file, that the AOPC does.  And

14   as a result, they are able to see whether they have a life-cycle

15   file for these people and what --

16       THE COURT:  So that you've found in the ex -- so, that

17   the expungement class, which you say, numbers a hundred and

18   thirty members, it's a hundred and thirty members, who had been

19   subjected to a life-cycle file review that wasn't disclosed?

20       MR. FRANCIS:  Correct.

21       Well, it -- it had -- they had been subject to a -- an

22   offense at some point, they had an offense on their record.

23       THE COURT:  Right.

24       MR. FRANCIS:  They had a subsequent expungement of

25   that offense.

1          THE COURT:  Right.

2          MR. FRANCIS:  The next step was, AOPC notified the

3     defendant of the expungement --

4          THE COURT:  Right.

5          MR. FRANCIS:  -- the defendant failed to look at that

6     or download that file or -- you know -- the technical, you know,

7     failure there, it's hard for me to understand, but what we do

8     know is, they did not incorporate that data in their records, so

9     that when they reported it out, they reported out the offense as

10    if it had not been expunged.

11         THE COURT:  Okay.

12         MR. FRANCIS:  So, in other words, the life-cycle file,

13    it's just an update.

14         THE COURT:  Right.

15         MR. FRANCIS:  So, because they had updates, the --

16         THE COURT:  What period of time, are we talking about?

17         MR. FRANCIS:  Ah, we were talking about a period of

18    time, between two years prior to the filing of the action, which

19    was in early of 2015 and then, up through the point of -- I want

20    to say, it was up through the point of July of 2015.

21         THE COURT:  Okay.

22         MR. FRANCIS:  Because the defendant in connection with

23    the settlement in this case, recognized that it had that error

24    and corrected its records after this lawsuit was filed and

25    settlement discussions had begun.

1          THE COURT:  Okay.

2          Now, let me just touch on the class definition with

3     respect to expungement.

4          MR. FRANCIS:  Yes, your Honor.

5          THE COURT:  And what that definition means with

6     respect to what people are encompassed in that class, speak to

7     that for me, if you will.

8          MR. FRANCIS:  Yes, your Honor.

9          So, the -- the settlement class for expungement is all

10    persons residing in the United States of America, including its

11    territories and Puerto Rico about whom from March 3rd, 2013

12    through the date when the Court enters its preliminary approval

13    order, that the defendant prepared a consumer report which

14    included information regarding one or more criminal cases, which

15    at the time the report was prepared by the defendant, had been

16    expunged or sealed and life-cycle identified the record as

17    having been expunged or sealed prior to the date of the report.

18         THE COURT:  How about if there were individuals, who

19    had been convicted of crimes that were expunged, but that

20    information came from sources other than life-cycle files, are

21    they included in the class?

22         MR. FRANCIS:  They are not included in the -- in the

23    class.

24         THE COURT:  Okay.

25         So, that the hundred and thirty members are the only

1    people in that period of time, that you've discovered from

2    Realpage's records, that were -- that the information came

3    through life-cycle files?

4         MR. FRANCIS:  Correct, your Honor, because other

5    states and other courts don't have a file like that --

6         THE COURT:  Okay.

7         MR. FRANCIS:  -- so, it's -- there is no way for us or

8    -- I don't want to say, there's no way -- but it -- we did not

9    learn of any way to learn if anybody else, other than these --

10   these one thirty and these one thirty were all subject to the

11   exact same violation, according to our theory of liability,

12   which was --

13        THE COURT:  Well, these were the only members that

14   were subjected to the exact same process and that's a process

15   which included life-cycle files?

16        MR. FRANCIS:  That's correct, your Honor --

17        THE COURT:  All right, okay.

18        MR. FRANCIS:  -- that's correct.

19        THE COURT: So, that any other expungement problems

20   which -- which do not involve life-cycle files, were not

21   included in this place?

22        MR. FRANCIS:  That's correct, your Honor.

23        THE COURT:  Okay.

24        MR. FRANCIS:  Moving towards the source settlement

25   class, I outlined before what the theory of liability there was

1   and your Honor correctly noted that this is not settled law of

2   the land, I think, we're right on this, I think, they have to

3   disclose the source of -- if it's a vendor or it's an

4   intermediary and as I indicated earlier, they are now doing that

5   as a result -- if the settlement is approved by your Honor --

6   they will now disclose that to consumers.  And that's -- for us,

7   that's correct view of the law, but again, it's not -- it's far

8   from settled.

9            So, for each member of the source class, in addition

10  to the injunctive relief, they will each get two hundred

11  dollars, which for a failure to disclose an item of information

12  like that, that is a very, very good number for that type of

13  violation.  And again, if we were to canvass the settlements,

14  which I am happy to do, I can assure your Honor that that is a

15  very good result for the failures to disclose that claim.

16           One of the things I did not mention earlier, that I

17  think is relevant or should be relevant to this Court's

18  analysis, we could only win this case by proving that the

19  defendant willfully violated the FCRA.

20           THE COURT:  Yes.

21           MR. FRANCIS:  There is no statutory damages, there are

22  no punitive damages, if we could not prove they willfully

23  violated.  While Mr. Raether and I, who re -- Mr. Raether, who

24  represents Realpage and I -- have for years vigorously disagreed

25  with what willfulness means under the statute and your Honor has

1   touched upon this in the past with some of your other FCRA

2   decisions, willfulness is not negligence, it's a higher

3   standard.

4          And if we did not -- were not able to prove that they

5   willfully violated the FCRA, we lose.  So, to be -- and a

6   willful violation of the FCRA entitles a consumer to between a

7   hundred and a thousand dollars.

8          So, here we're getting the source class, a guaranteed

9   payment of two hundred dollars, which is within the range of

10  statutory damages for a willful violation in the context of a

11  claim that the defendant does not believe is settled and they

12  don't think our view of the law is right.

13         Moving on, there is another class, the chart class --

14         THE COURT:  Well, before we leave the source class --

15         MR. FRANCIS:  Yes, your Honor.

16         THE COURT:  -- as I understand it, there are 4681

17  people --

18         MR. FRANCIS:  Yes, your Honor.

19         THE COURT:  -- in that class, how did you determine

20  that number?

21         MR. FRANCIS:  Yes, your Honor.

22         Each one of those people, was somebody who wrote or

23  contacted the defendant and asked for a copy of their file.  The

24  defendant maintains records of everybody to whom it sends a

25  correspondence or a copy of their file, whether the request is

1   made by telephone, e-mail or whether it's made by mail, so it

2   came from their records.

3           THE COURT:  Okay.  Now, the chart class.

4           MR. FRANCIS:  Yes, your Honor.

5           As I think was clear from my -- my outline earlier,

6   the main --

7           THE COURT:  Well, before we leave source --

8           MR. FRANCIS:  Yes, your Honor.

9           THE COURT:  -- these individuals may have suffered

10  actual damage.

11          MR. FRANCIS:  Which individuals, your Honor?

12          THE COURT:  The source class members --

13          MR. FRANCIS:  Yes.

14          So, they --

15          THE COURT:  -- of more than two hundred dollars?

16          MR. FRANCIS:  So, that's a good question.

17          One of the things that I was going to address but I'll

18  address it now, is one of the other things about the settlement

19  that we're very proud of that, is the release is tailored and

20  narrowly limited.

21          So, if somebody in the -- your Honor is correct as to

22  the (g)(a)(2) claim --

23          THE COURT:  Right.

24          MR. FRANCIS:  -- if somebody has actual damage, I am

25  really upset because you didn't disclose the source or I

1    suffered immense financial harm, because I didn't get that

2    information.

3              THE COURT:  Right.

4              MR. FRANCIS:  You're correct, that claim would be

5    released and that's within the two hundred dollars and -- but

6    all of the other FCRA claims that they might have, if -- the

7    inaccuracy claim published, maybe, something was published

8    inaccurately about them, maybe, they disputed something, they're

9    all preserved.  They could bring FCRA claims against this

10   defendant.  So, it's only actual damages relating to the failure

11   to -- for the defendant to identify the source.

12             THE COURT:  Well, let's take a typical tenant, who

13   wants to enter into a lease with a landlord and loses the

14   opportunity to enter that lease, because of inaccurate

15   information --

16             MR. FRANCIS:  Yes.

17             THE COURT:  -- that's been through the system and it

18   took that tenant another six months to find a likely place and

19   by that time, the rental went up significantly.

20             MR. FRANCIS:  Yes.

21             THE COURT:  What happens to that actual damage claim?

22             MR. FRANCIS:  That tenant can still bring a claim for

23   the misreporting of the inaccurate information in the first

24   instance, that --

25             THE COURT:  And --

1        MR. FRANCIS:  -- tenant cannot bring a claim, because

2   the information or the source wasn't disclosed to them.  So, in

3   other words, the -- the bulk of the individual FCRA claims that

4   generates sizable compensatory damage classes, are the

5   inaccuracy claims.

6        THE COURT:  They continue to live?

7        MR. FRANCIS:  Right.

8        The accuracy claims and the --

9        THE COURT:  The accurately claims --

10       MR. FRANCIS:  -- and the investigation claims --

11       THE COURT:  Yes.

12       MR. FRANCIS:  -- somebody writes and disputes a

13   million times and the credit-reporting agency doesn't respond,

14   all of those claims are preserved and we are very -- that we

15   specifically, negotiated that release, so that they would not be

16   impacted, that tenant can still bring a claim against this

17   company for the misreporting of the inaccurate information.

18       THE COURT:  Okay.  Chart class.

19       MR. FRANCIS:  Okay.

20       Chart class, so as I think I tried to outline before,

21   the chart class was really a -- an ancillary and a -- a pendent

22   claim brought in the Jenkins litigation, but the main claims

23   were as I outlined, the expungement and the -- the source-class

24   claims.

25       There was a period of time for certain consumers that

1    when they asked Realpage --

2            THE COURT:  It's -- this is an injunction-only relief?

3            MR. FRANCIS:  Yes, your Honor.

4            THE COURT:  Yes, okay.

5            MR. FRANCIS:  It's an injunction-only, your Honor, but

6    the release is only for that injunction-only claim.  In other

7    words, if they have an inaccuracy, they can bring a claim, if

8    they have even a different source claim, they can bring a claim.

9    So, I want to make that -- make sure that that's clear.

10           What happened was, there was a period of time, when

11   certain consumers would ask for their file online, an e-mail

12   version and the defendant would e-mail it to them.

13           And one of the things that Section 1681(g)(c) of the

14   Fair Credit Reporting Act requires is that in addition to the

15   information I outlined, the -- all of the information in the

16   file, the source, the CRA also has to provide the FTC statement

17   of rights.

18           For whatever reason, when consumers would get their

19   file online from Realpage, there was a period of time, where the

20   FTC statement of rights, it wasn't formatted right and it

21   wouldn't have the numbers and it wouldn't -- it was -- it was

22   jumbled and it was garbled, no other claims, just that -- that

23   happened.  So, that was a -- the defendant have a very strong

24   argument, that was a technical error, good luck in proving

25   willfulness for that claim.

1    So, what we decided to do was -- which I think was the

2  right thing to do, I still do -- was give injunctive relief for

3  those people as well as anybody going forward, if they need

4  their FTC statement of rights, they can get it.  Do not release

5  any of their good accuracy claims.  And the only thing that the

6  chart class releases is a claim arising from any damage that the

7  information on that form was garbled, that's -- that's the chart

8  class.

9    THE COURT:  What's the injunctive relief for the chart

10  class?

11    MR. FRANCIS:  So, the injunctive relief is that they

12  can get a copy, they can go online and go to the website in this

13  case.

14    THE COURT:  Well, what about those people, that don't

15  have access to -- to websites or online --

16    MR. FRANCIS:  Ah, those people --

17    THE COURT:  -- what do they do?

18    MR. FRANCIS:  -- will be able to ob -- they'll be

19  getting notice and if -- they will be given a number by which

20  they can get that information through a telephone number.

21    THE COURT:  And how long will the list be available on

22  the Internet?

23    MR. FRANCIS:  Well, the -- the list on the Internet --

24  that's a good question, I don't have the answer for that, but I

25  can find that out.

24

1          It will be available -- I don't know, I feel --

2          THE COURT:  I thought I saw, six months.

3          MR. FRANCIS:  -- six months, okay.

4          (Discussion held off the record at 11:27 a.m.)

5          MR. FRANCIS:  I think the -- that sounds right, your

6     Honor.

7          MR. SEARLES:  Yeah, it's a hundred and eighty days

8     from the effective date, your Honor.

9          THE COURT:  Six month?

10          MR. SEARLES:  That's correct.

11          MR. FRANCIS:  A hundred and eighty days -- yeah, from

12     the effective date, that's correct, I do recall that now.

13          But I think, importantly, the defendant has changed

14     its -- the glitch, so even if they were to go Realpage in ten

15     years or five years or three years, the defendant is going to

16     disclose their rights to them.  So, this is -- that would only

17     be for the -- the past --

18          THE COURT:  Well, the six-month list is -- I mean,

19     we're talking about a list on a website.

20          MR. FRANCIS:  Correct.

21          THE COURT:  And the six months means that the list has

22     to remain on the website for six months.

23          MR. FRANCIS:  Yes, your Honor.

24          THE COURT:  Right.

25          But the other way -- the other way, that the public

1    could get that information, would be to call or write directly?

2                MR. FRANCIS:  Correct.

3                And not only that, your Honor, if for example, they

4    didn't want to go to the website for their settlement --

5                THE COURT:  Right.

6                MR. FRANCIS:  -- instead, they'd just ask Realpage

7    when they'd get notice, what -- what is this, Realpage, what

8    happened?  If they'd just ask for their file disclosure that

9    they're entitled to under the FCRA, they're going to get it

10   there as well, because the defendant has corrected its

11   procedures.

12               THE COURT:  Okay.

13               MR. FRANCIS:  So, those are the -- that's -- that's an

14   overview of the -- of the three classes and the recovery that's

15   available for those three classes.

16               And a history, hoping to demonstrate to the Court,

17   that the -- the settlement was arm's length.  There are several

18   other provisions that the Court, obviously, will look at and

19   want to review and obviously, there is a request for attorneys

20   fees, that we haven't decided yet, but it allows --

21               THE COURT:  Let's talk about the money.

22               MR. FRANCIS:  Yes, your Honor.

23               THE COURT:  And the money that the defendant is

24   putting up, as I totaled it, is a $1,079,200.00.

25               MR. FRANCIS:  Yes, your Honor.

1          THE COURT:  Okay.

2          And that amount was arrived at by taking the number of

3     members in the expungement class, which was a hundred and thirty

4     members and taking the agreed-upon maximum amount of coverage

5     per member of eleven hundred dollars, that's about $143,000.00.

6          MR. FRANCIS:  Yes, your Honor.

7          THE COURT:  Then, with respect to the source, there

8     are 4681 members of the punitive class, that could recover up to

9     two hundred dollars and that came to $936,200.00.

10         So then, if every member of each class showed up and

11    collected, the agreed-upon maximum amount, there wouldn't be

12    enough money there to pay it, because out of that same amount,

13    we would have counsel fees, where counsel has agreed to a

14    maximum of one-third and that would be one-third of

15    $1,079,200.00.  Plus -- as I understand it -- there would be

16    legal costs reimbursed and then, administrative costs and then,

17    taxes.

18         What can you tell me about the sufficiency of the

19    amount of money that this settlement produces with respect to

20    payment to those people, who actually were involved -- the

21    citizens?

22         MR. FRANCIS:  Yes, two -- two things, your Honor.

23         THE COURT:  Right.

24         MR. FRANCIS:  First, the reason that --

25         THE COURT:  First of all --

1          MR. FRANCIS:  Yes.

2          THE COURT:  -- am I right in my approach to the money

3   on this?

4          MR. FRANCIS:  You are right --

5          THE COURT:  Okay.

6          MR. FRANCIS:  -- you are right --

7          THE COURT:  All right.

8          MR. FRANCIS:  -- that what we did was, which we'd -- I

9   -- we believed was it appropriate and I do believe it was

10  appropriate -- was before we even looked at legal fees, we

11  negotiated each class individually, right, what they should get

12  and we went back and forth, back and forth --

13         THE COURT:  Right.

14         MR. FRANCIS:  -- over two years, right.

15         And then, from that recovery -- and your Honor is

16  correct -- that attorneys fees will come out of that as well as

17  the claims administration, those are the two main costs.

18         And even with -- with that, I would still assert to

19  the Court, that -- even assuming were the Court to grant fee of

20  one-third, which we will argue for --

21         THE COURT:  Yes.

22         MR. FRANCIS:  -- it still is a settlement that is more

23  than adequate and fair for this --

24         THE COURT:  Well, let's -- let's set -- I mean, well,

25  let's assume, well, one-third of one million seven -- seven

1   ninety is, what, about 300,000 plus, $350,000.00.

2          Now, do you have an estimate of costs -- legal costs?

3          MR. FRANCIS:  In terms of the legal costs, ah, I -- I

4   don't, obviously, we would -- we would have to see -- ah --

5   sitting here today, I don't have that, that's something that --

6          THE COURT:  More or less than twenty-five thousand?

7          MR. FRANCIS:  Oh, we would think, much less than

8   twenty-five thousand.

9          THE COURT:  Okay.

10         MR. RAETHER:  And your -- your Honor, we had a quote

11  from the Administrator --

12         THE COURT:  That's where I am going next --

13         MR. RAETHER:  -- well --

14         MR. FRANCIS:  Well --

15         THE COURT:  -- the legal costs I am talking about are

16  counsel's costs --

17         MR. RAETHER:  Yes.

18         THE COURT:  -- for filings.

19         MR. FRANCIS:  That's what I understood, your Honor --

20         THE COURT:  That's it, okay.

21         MR. FRANCIS:  -- that's what I understood.

22         It's certainly well, I would estimate, well less than

23  twenty-five thousand.

24         THE COURT:  Okay.

25         MR. FRANCIS:  Okay.

1        And the biggest --

2        THE COURT:  I'm going to put down $10,000.00.

3        MR. FRANCIS:  -- ah, the biggest cost would be the --

4        THE COURT:  You had depositions?

5        MR. FRANCIS: -- mediation.

6        We did not have depositions.

7        THE COURT:  Oh, well, you had mediation, too, no, this

8  is --

9        MR. FRANCIS:  But --

10       THE COURT:  -- I'm surprised that it -- I'm surprised

11  if it's under $20,000.00.

12       MR. FRANCIS:  I think, it will be around the

13  $20,000.00 range with all the firms.

14       THE COURT:  Okay.

15       Now, administrative costs, they're -- counsel said,

16  that is -- you have assessed what the administrative costs are

17  likely to be?

18       MR. FRANCIS:  Yes.

19       THE COURT:  And let me have those numbers.

20       MR. FRANCIS:  Yes, your Honor.

21       We -- as we normally do -- we solicited bids from

22  three class-action administrators, because --

23       THE COURT:  Yes.

24       MR. FRANCIS:  -- we wanted to make sure that we

25  competitively vet this process and we don't just hand the number

1  to the highest figure.

2          We asked three companies to provide bids, one was

3  American Legal Claim Services, one was, Dahl Administrators and

4  the other one was RSM.  We selected -- or have proposed to be

5  the selected administrator ALCS, because they came in much

6  cheaper and they do good work and they were, by $10,000.00

7  cheaper than the low -- than the second one.

8          And I have an estimate for the Court, if it would like

9  it.

10          THE COURT:  Yes, what -- what is that?

11          MR. FRANCIS:  It's about twenty-nine thousand.

12          THE COURT:  Okay, okay.

13          So, we have around $400,000.00, then there's -- in the

14  request, are there any other costs, well, there's the -- there's

15  the fee for each of the claimants, which is requested at ten

16  thousand dollars for each of the plaintiffs?

17          MR. FRANCIS:  Correct, your Honor.

18          THE COURT:  Were they deposed?

19          MR. FRANCIS:  Ah, they were not deposed.

20          THE COURT:  What did they do, other than meet with

21  counsel and allow the punitive class action to be brought in

22  their names --

23          MR. FRANCIS:  Well --

24          THE COURT:  -- or is that it?

25          MR. FRANCIS:  -- your Honor, they were -- they were

1    available at all times, they helped us answer the discovery

2    requests --

3              THE COURT:  Okay.

4              MR. FRANCIS:  -- made themselves available for that.

5    They came in to the offices of CLS.  They were available for

6    deposition at any time.  And they are -- they've given their

7    full cooperation to this -- this proceeding.

8              THE COURT:  Okay.

9              So, there's four -- roughly, 420,000.00 -- and then

10   the agreement -- as I recall -- provides that any taxes are

11   going to be -- have to be paid by the recipients, all kinds of

12   taxes as the agreement states --

13             MR. FRANCIS:  Well --

14             THE COURT:  -- and I have no idea of what amount is

15   going to be, is there any assessment, what taxes are we talking

16   about and how much --

17             MR. FRANCIS:  Ah --

18             THE COURT:  -- is that likely to be?

19             MR. FRANCIS:  -- I -- I don't have that figure for the

20   Court right now, what all of the taxes would be.  I -- I don't

21   anticipate it being sizable, but you know, I think, it depends

22   on --

23             THE COURT:  Well --

24             MR. FRANCIS:  -- yeah, individual amounts.

25             THE COURT:  So, we have one idea what those taxes are

1   likely --

2           MR. FRANCIS:  Well, I -- it's obviously, everybody's

3   tax burden is somewhat different --

4           THE COURT:  Right.

5           MR. FRANCIS:  -- let -- may I consult with my co-

6   counsel one second?

7           THE COURT:  Absolutely -- absolutely, sure.

8           (Discussion held off the record at 11:36 a.m.)

9           MR. FRANCIS:  So, your Honor, as I -- as I thought, so

10  that the -- the taxes would be individualized, because for

11  anybody receiving less than $600.00, they would not be 1099'd,

12  but over $600,00, so the expungement class, that's really where

13  you would -- you would see the taxes.

14          Since it's not an employment case, there would not be

15  Social Security taken out of it --

16          THE COURT:  Right.

17          MR. FRANCIS:  -- but so, we're talking about the

18  hundred and thirty people, who would get an amount in excess of

19  $600.00 and then, that would be individualized, it's not to

20  them.

21          THE COURT:  Okay.

22          So, so far I'm at $420,000.00 on counsel fees, legal

23  costs, administrative costs and the $10,000.00 fee for each of

24  the plaintiffs, I'm at $420,000.00.  That leaves us about --

25  what -- six hundred thousand, plus for distribution.  Okay.

1              Now, is there going to be any allocation of the costs

2     to the classes or is -- or are the costs, simply going to be

3     taken from the top, you know, taken -- taken from total amount

4     that's put up, so that, in essence, every individual claimant is

5     going to bear the same amount of costs, including people --

6     well, both classes -- certainly both classes, all three classes

7     would absorb the same amount of costs.  So, is there any comment

8     you'd have with respect to that?

9              MR. FRANCIS:  Yes, your Honor.

10             The answer is that is correct, part of the reason for

11    that is, it's difficult in terms of setting up a website and

12    some of those costs are difficult to divide.  Obviously, postage

13    could be -- could be assessed.

14             But much -- we've tried to keep the costs down by

15    using e-mail notice for people for whom their e-mail -- e-mail

16    is available.  And what we know is they are about eighty percent

17    of the class that has e-mails available.

18             So, some people are going to get e-mails, some people

19    are going to get followup postage, so it's really hard to do

20    that on a per person or per a class basis.

21             THE COURT:  Okay.  I understand that.

22             Now, let me go to the next question and that is, how

23    are you going to allocate this $600,000.00, how are you going to

24    arrive at what each person in the two classes are going to get

25    out of this $600,000.00?

1          MR. FRANCIS:  Because, your Honor, what it

2    contemplates is that the -- the cost -- the settlement

3    administrative costs would come off the top --

4          THE COURT:  That's right.

5          MR. FRANCIS:  -- okay.

6          THE COURT:  We -- we did that, it's six hundred

7    thousand, approximately, that's left for distribution.

8          MR. FRANCIS:  No, that includes fees, the six hundred

9    thousand left includes the attorneys' fees.

10         I was saying, that the -- the settlement administrator

11   expenses, the -- the twenty-nine thousand.

12         THE COURT:  Oh, yes, okay, okay.

13         MR. FRANCIS:  So, that comes off the top --

14         THE COURT:  Okay.

15         MR. FRANCIS:  -- and then, the fee would be assessed,

16   the attorney fee would be assessed at whatever the percentage

17   the Court were to allow, again, we've --

18         THE COURT:  Right, okay.

19         MR. FRANCIS:  -- petition up for a third --

20         THE COURT:  Right, okay.  Right.

21         MR. FRANCIS:  -- everybody would pay a third.

22         THE COURT:  Okay.  All right.

23         MR. FRANCIS:  So, for example, somebody getting two

24   hundred dollars for the source claim, if the Court were to

25   approve a third fee, they would get two hundred dollars minus a

1    third.

2            THE COURT:  Right.

3            MR. FRANCIS:  And somebody getting eleven hundred

4    dollars in the expungement class, eleven hundred dollars minus a

5    third --

6            THE COURT:  Right.

7            MR. FRANCIS:  -- or minus whatever the Court were to

8    approve.

9            THE COURT:  Right.  All right.

10           Let me just take a look at my notes.

11           (Pause at 11:39 a.m.)

12           THE COURT:  Okay.

13           I am going to take about a ten-minute recess, I want

14   to go through some other notes, I have which may -- I want to

15   take a look, again, at the release a little more carefully.

16           But let me give you -- you know -- let me allow you to

17   finish your presentation, then we'll take that recess.  Then, I

18   may come back with more questions.

19           MR. FRANCIS:  Thank you, your Honor.

20           THE COURT:  Okay.

21           MR. FRANCIS:  Just a couple of additional points.

22           Regarding class certification, we outlined why the

23   claims are certifiable under Rule 23.  I can go through that of

24   each element right now or --

25           THE COURT:  No, I think you've made a full

36

1   presentation of that in your submissions.

2        MR. FRANCIS:  The only thing that I would add to that

3   is that, regarding the adequacy of counsel and I think this,

4   hopefully, should provide the Court with some additional

5   information regarding the arm's length nature of this

6   settlement.

7        In addition to what we've submitted regarding the

8   adequacy of the funds, I and my firm just obtained a -- the

9   largest FCRA class action verdict within the last month, a sixty

10  million dollar verdict against Transunion.  And I don't say that

11  to brag, but I say it to show the Court, that we are not a firm

12  that somebody is going to wave some money and we'd just settle

13  cases.

14       We're -- we're the only ones who have tried FCRA cases

15  to a verdicts like that.  And if there is this case we thought,

16  it should have been tried for the amount that was offered, I'd

17  be happy to try it.

18       THE COURT:  Hm-hmm.

19       MR. FRANCIS:  The other thing that I would mention for

20  the Court, is that as the Court may have recalled, Mr. Jenkins

21  had had an individual claim that was not a --

22       THE COURT:  Yes, I do recall that --

23       MR. FRANCIS:  -- not a --

24       THE COURT:  -- what happens to that claim?

25       MR. FRANCIS:  So, that claim is in the process or --

1   of being settled or it has been settled, be -- as a -- in

2   connection with Rule 23 and our -- our obligation to disclose

3   that to the Court --

4           THE COURT:  Yes.

5           MR. FRANCIS:  -- when that's finalized, we are going

6   to present the Court with a stipulation to dismiss that claim

7   from the Jenkins case.  And also to demonstrate that it's not

8   tied in any way -- his individual claim -- is not tied to the

9   class relief or his support of the settlement --

10          THE COURT:  Yes.

11          MR. FRANCIS:  -- they're independent, they're not

12  conditional and we worked very hard to make sure that that

13  stayed out.

14          THE COURT:  Right.

15          MR. FRANCIS:  But -- but those are only additional

16  points that I would have made.

17          THE COURT:  Thank you.

18          We'll take a five or ten-minute recess and I'll be

19  back.  Okay.

20          MR. FRANCIS:  Thank you, your Honor.

21          DEPUTY CLERK:  All rise.

22          (Brief recess is held at 11:42 a.m.)

23          (Resumed in open court at 12:04 p.m.)

24          THE COURT:   Defense counsel, you may come forward.

25          MR. RAETHER: Good afternoon, your Honor.

1          THE COURT:  Good afternoon, Counsel.

2          MR. RAETHER:  Thank you for indulging a California

3    attorney to be able to practice in your court.

4          THE COURT:  Our pleasure to have you here.

5          MR. RAETHER:  I appreciate it.

6          I am not going to spend a lot of time today, other

7    than to let you know that Realpage is in support of this

8    settlement.

9          If it wasn't clear from Mr. Francis's presentation, it

10   was obviously, a contentious matter.  Over the two years that

11   we've litigated this case, we've had many opportunities of

12   disagreement with respect to the three claims that are being

13   settled here.

14         I am not going to go through all three of them and

15   explain how our position diverged from Mr. Francis and why we

16   thought we had a likelihood of success with respect to each of

17   those three claims.

18         But I do want to point out for your Honor with respect

19   to 1681(g)(a)(2) claim, that's the failure to disclose the

20   source, your Honor will recall that we did file a motion to

21   dismiss based on the decision out of the U.S. Supreme Court in

22   Spokeo.

23         The Fourth Circuit more recently has reached a

24   decision in a matter filed by Drayer against Experience

25   Solutions, Inc. and in that -- and in that opinion, your Honor,

1   the Fourth Circuit did find that Experience's failure to

2   disclose the source, was not the type of concrete harm that

3   created an Article III standing.  So, if this case had not

4   settled, your Honor, we would have presented Drayer, a Fourth

5   Circuit opinion to the Court for further consideration.

6           I think, importantly -- and Mr. Francis did mention

7   that all of his claims were based on the need for a finding of

8   willfulness.

9           And under Safco, there's two important prongs to that,

10  one is whether the provision is ambiguous and if so, is there

11  any controlling authority?  What the Supreme Court said in Safco

12  with respect to controlling authority is that:

13          That would be limited to opinions out of the

14          Circuit Court of Appeals, the Supreme Court or the

15          regulatory agency, who is given the authority to

16          oversee that particular statutory provision.

17          Given that the Fourth Circuit is the only court that

18  has spoken on the application of Article III standing with

19  respect to a 1681(g)(a)(2) claim, we felt that that argument was

20  strong, not -- with respect to the permits of my client's

21  position with respect to what it reported, but also with respect

22  the willfulness prong to the plaintiffs' claim.

23          So, I have -- obviously -- a disagreement with respect

24  to what transpired in terms of the expungement class as well as

25  the chart class.  I'm happy to provide any further detail or

1  answer any questions your Honor has about those claims or about

2  the <u>Drayer</u> opinion.

3          THE COURT:  No, I -- I do recognize that the issues in

4  this case have -- have been up to this point, hotly contested

5  and would remain hotly contested.

6          And certainly, with respect to the Third Circuit, this

7  is the type of issue that could very well go up to the Third

8  Circuit and you -- and being taken up there by either side,

9  depending on what the District Court did.

10         So, I do recognize the fact that this was hotly

11  contested litigation and I also acknowledge the fact that this

12  settlement is a settlement, it's not an unconditional surrender

13  from the defendant and it's a settlement that has resulted from

14  hard negotiations and a long mediation path.  So, I am satisfied

15  in that regard, thank you, Counselor.

16         MR. RAETHER:  Okay.  Thank you for your time, your

17  Honor.

18         THE COURT:  Okay.

19         Now, here -- here is where I am.

20         I am satisfied that based on the submissions and on

21  today's hearing, that preliminary approval of the settlement and

22  a direction to give notice to the class, is appropriate under

23  all of the circumstances.

24         There are two reservations that I have, one, we had

25  some conversation about -- in chambers -- and that is, what the

1    notice should say with respect to what claims are actually being

2    released within the context of this settlement -- this

3    settlement proposal.

4           And, therefore, the parties will be submitting to me,

5    a notice that -- that addresses that reservation that I have.

6    And so, from the standpoint of what the notice should be and

7    what the notice should say, you know, we'll revisit that when we

8    receive an amended submission regarding the notice to the class.

9           The other reservation I have is the allocation of

10   $10,000.00 to each of the plaintiffs and the question in my mind

11   is, whether or not that's excessive.  And I -- I measure that,

12   not only on the basis of what they have done, which was,

13   essential and important for all of the members of the punitive

14   class, but I also measure that within the context of what the

15   class members on an individual basis might be getting by way of

16   a distribution, of course, it certainly wouldn't be anywhere

17   near $10,000.00.

18          So, I do have some reservation about that and I'd

19   suggest that, you know, I will approve a settlement.  I will,

20   preliminarily approve the settlement that contains a payment to

21   each of the class -- each of the plaintiffs -- in an amount up

22   to $10,000.00.  And then, I will make that determination as we

23   get down closer to the -- or at the time that we -- we consider

24   final approval.

25          Any problem with the mechanics that I've stated with

1    respect to the notice and with respect the amount paid to Helen

2    Stokes and James Jenkins?

3              MR. RAETHER:  No, your Honor.

4              In fact, you -- you preempted what I was going to

5    suggest, which was that, preliminary approval doesn't mean this

6    Court agrees that ten thousand --

7              THE COURT:  Right.

8              MR. RAETHER:  -- dollars is appropriate.

9              THE COURT:  Right.

10             MR. RAETHER:  But we would like the right to be able

11   to try to persuade your Honor --

12             THE COURT:  Absolutely.

13             MR. RAETHER:  -- at the final-approval stage and,

14   maybe, bring the plaintiffs and --

15             THE COURT:  Sure.

16             MR. RAETHER:  -- and document what they did and their

17   participation and if the Court is not satisfied, the Court has

18   the discretion to award less than ten thousand.

19             THE COURT:   Fine, okay.

20             MR. FRANCIS:  Anything, Mr. Francis?

21             MR. FRANCIS:  No, your Honor.

22             THE COURT:  Okay.

23             Thank you -- well done, Counsel -- thank you for

24   coming in.

25             And we'll issue an appropriate order, okay.

43

1          MR. RAETHER:  Thank you, your Honor.

2          THE COURT:  Okay.

3          DEPUTY CLERK:  Court is adjourned.

4          (Adjourned in this matter at 12:11 a.m.)

5                         * * *

C E R T I F I C A T E

I do hereby certify that the foregoing is a correct

transcript of the electronic-sound recording of the

proceeding in the above-entitled matter.

_____          Date: September 11, 2017
Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270